Erik F. Stidham (admitted *pro hac vice*)
Holland & Hart LLP
800 W. Main Street, Suite 1750
Boise, ID 83702-7714
Telephone: 208.342.5000
Email: efstidham@hollandhart.com

Engels Tejeda (#11427)
Ben Passey (#19324)
HOLLAND & HART LLP
222 S. Main Street, Suite 2200
Salt Lake City, UT  84101
Telephone: (801) 799-5800
Email: ejtejeda@hollandhart.com
        bdpassey@hollandhart.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IN RE:<br><br>AMMON EDWARD BUNDY,<br><br>Debtor(s), | Bankruptcy Case No. 24−23530 WTT<br><br>Chapter 7<br><br>Honorable William T. Thurman |
| ST. LUKE'S HEALTH SYSTEM, LTD.,<br>ST. LUKE'S REGIONAL MEDICAL CENTER, LTD.,<br>CHRIS ROTH, NATASHA D. ERICKSON, M.D., and<br>TRACY W. JUNGMAN, NP,<br><br>Plaintiffs,<br><br>v.<br><br>AMMON EDWARD BUNDY,<br><br>Defendant. | Adversary Proceeding No. _____ |

## ST. LUKE'S PARTIES' COMPLAINT TO DENY DEBTOR
## A DISCHARGE PURSUANT TO 11 U.S.C. § 727

St. Luke's Health System, Ltd. ("St. Luke's HS"), St. Luke's Regional Medical Center,

Ltd. ("St. Luke's RMC"), Chris Roth ("Mr. Roth"), Natasha D. Erickson, M.D. ("Dr. Erickson"),

and Tracy W. Jungman, N.P. ("NP Jungman") (collectively "Plaintiffs" or the "St. Luke's

Creditors") bring this Complaint to Determine Non-Dischargeability of Debt ("Section 727

Complaint") against Ammon Bundy ("Debtor Bundy") and respectfully allege as follows:

## I.    PRELIMINARY STATEMENT

1.     In violation of Section 727 of the Bankruptcy Code, Debtor Bundy has acted and

continues to act to hinder, delay, and defraud the St. Luke's Creditors from collecting on their

more than $50,000,000 judgment against him. Within the year prior to filing bankruptcy and

continuing to today, Debtor Bundy has concealed millions in assets by making fraudulent

transfers, hiding assets in the names of others, using agents to collect debts, engaging in cash

transactions, flouting court orders, making false statements in court filings, and dodging two

pending warrants for his arrest from Idaho courts. Given Debtor Bundy's past and ongoing

violations of the Bankruptcy Code, Debtor Bundy is not entitled to a discharge.

2.     For more than a decade, Debtor Bundy has manufactured false conspiracies,

instigated armed standoffs, and defied laws to garner media attention, political influence,

financial gain, and followers. During that time, Debtor Bundy has become adept at using social

media and online extremist connections to broadcast his false conspiracies to hundreds of

thousands of people.

3.     In 2022, Debtor Bundy engaged in a grift to get media attention for himself and

his campaign to become Governor of Idaho. Debtor Bundy launched a knowingly dishonest

smear campaign exploiting the tragic circumstances surrounding a medically neglected infant

("Infant") who had been taken into protective custody by Child Protective Services. Debtor

Bundy falsely stated the Infant was healthy when taken into custody, and falsely accused St.

Luke's HS, its Chief Executive Officer ("CEO"), a doctor, and a nurse practitioner of

participating in a vast conspiracy that purportedly included government officials in Idaho and

engaged in the widespread kidnapping, trafficking, sexual abuse, and killing of Christian

children in Idaho.

4.      Debtor Bundy used the false conspiracy to get attention for himself, even though

he knew his lies would cause his followers to harass the St. Luke's Creditors, cause financial

losses for St. Luke's HS, and endanger employees and patients at St. Luke's RMC. In fact,

Debtor Bundy worked tirelessly to maximize the harassment, increase the losses, and increase

the risks to hospital patients and employees.

5.      Debtor Bundy's actions had the effect he desired. Debtor Bundy's false

statements caused his followers to harass and make death threats against the St. Luke's CEO and

other employees. As directed by Debtor Bundy, his followers attacked St. Luke's hospital

operations with thousands of abusive phone calls that repeatedly crippled the hospital's phone

system, made death threats which taxed hospital security, and mounted armed disruptions which

caused lockdowns at the hospital and endangered patients and employees. His false statements

also caused thousands of his followers to harass and to continue to harass St. Luke's Creditors

online.

6.      Knowing that Debtor Bundy needed to be held accountable, the St. Luke's

Creditors filed a lawsuit styled, *St. Luke's Health System, Ltd., et al. v. Ammon Bundy et al.*,

Case No. CV01-22-6789, in the Fourth Judicial District Court of Idaho, County of Ada

("Defamation Lawsuit"), against Debtor Bundy and his co-conspirators in an Idaho state court on

May 11, 2022. The Defamation Lawsuit included claims for defamation, invasion of privacy,

intentional infliction of emotional distress, and violations of the Idaho Charitable Solicitation

Act.

7.      Over the course of the Defamation Lawsuit, all causes of actions were established

against Debtor Bundy and the other defendants. Then, in July of 2023, a two-week jury trial was

conducted.

8.      Based on the evidence, the Idaho jury unanimously determined that Debtor Bundy

was liable, jointly, and severally with his co-defendants, for more than $50,000,000 in

compensatory and punitive damages. To reach its verdict, the jury considered Debtor Bundy's

own video posts, Debtor Bundy's admissions of his malicious intent, testimony from more than

twenty witnesses, expert testimony that the Infant was suffering from medical neglect and could

have died had he not been taken into protective custody, evidence Debtor Bundy caused hospital

lockdowns by inciting armed mobs to force the hospital to release the Infant, and proof of tens of

millions of dollars of financial damage to the hospital.

9.      On August 29, 2023, the trial court entered a formal judgment ("Judgment") in

line with the jury's award. And based on the trial court's independent findings, the trial court

issued a Permanent Injunction against Debtor Bundy. The Permanent Injunction is attached as

**Exhibit A** and incorporated hereto.

10.     In reaching the verdict and through the Permanent Injunction, both the jury and

the trial court found that Debtor Bundy had willfully and maliciously harmed the St. Luke's

Creditors.

11.     Since the Judgment was entered, Debtor Bundy has flouted the Permanent

Injunction and has engaged in and continues to engage in fraudulent acts to conceal assets and

prevent the St. Luke's Creditors from collecting on their Judgment.

12.     To avoid paying the Judgment, Debtor Bundy hindered collection and concealed

millions in assets during the year immediately prior to his bankruptcy filing. As Debtor Bundy

himself has testified, he had assets worth between six and seven million dollars when the

Judgment was entered in August of 2023, and those assets included millions in real estate,

contracts, leases, cash, securities, and interests in business entities.

13.     But by the time he filed a petition for relief under Chapter 7 of the Bankruptcy

Code in the above captioned case on July 17, 2024 (the "**Petition Date**"), Debtor Bundy

fraudulently declared only about $1.4 million in assets. *See* Debtor's Schedules, Dkt. 19 at ECF

10.[1] Debtor Bundy continued to misrepresent his assets in further disclosures and sworn

testimony in proceedings before the Bankruptcy Court.

14.     Debtor Bundy's efforts to defraud and hinder the St. Luke's Creditors are not

secret. In fact, Debtor Bundy has repeatedly boasted of his efforts to prevent St. Luke's

Creditors' collections in video posts to his followers, while under oath, and in filings in the

bankruptcy case where he admits, proudly, that he concealed millions in assets to hinder or block

the St. Luke's Creditors from collection. Debtor Bundy's fraudulent actions included, but were

not limited to, engaging in a fraudulent transfer of his farm property ("Harvest Lane Property")

which is valued at more than $1 million, placing millions of his personal assets in a sham

---

[1] That amount included $1,180,000 for a property that Debtor Bundy knew he no longer owned
as of the Petition Date.

corporation Abish-husbondi, Inc. ("Abish-husbondi") which Debtor Bundy treated as his alter

ego, placing bank accounts in the names of others, purchasing stocks in the names of others,

creating sham corporations in the name of his relatives, fraudulently transferring at least

$450,000 in assets to his brothers, and fraudulently concealing shares of Abish-husbondi in the

names of a corporation run by two of his followers. Each of these wrongful actions were initiated

or continued during the year preceding the Petition Date.

15.     Since the Petition Date, Debtor Bundy has continued to make false statements

regarding his assets, taken actions to conceal his assets, and fraudulently transferred his assets.

Debtor Bundy's bankruptcy petition and schedules intentionally misrepresent and conceal assets.

For example, Debtor Bundy omitted assets from his bankruptcy disclosures, including leases,

contracts, $200,000 in cash, ownership of at least two companies, intellectual property, internet

domains, and the location of bank accounts.

16.     In bankruptcy proceedings, Debtor Bundy has, among other things, refused to

cooperate with the Chapter 7 Trustee, refused to comply with discovery obligations, refused to

respond to questions during an examination ordered by the Court, unilaterally terminated his

court-ordered examination before completion, (on information and belief) directed his siblings to

refuse to appear for properly noticed examinations and acted to conceal assets.

17.     Debtor Bundy has taken no steps to provide the Chapter 7 Trustee with any of the

limited unexempt assets that he identified in his schedules. Debtor Bundy has repeatedly flouted

court orders and procedural obligations, defied arrest warrants, and expressed a willingness to

threaten and engage in armed standoffs with authorities. In turn, circumstances imply that Debtor

Bundy's wrongful actions are hindering and delaying even the collection of disclosed assets. In

the nine months since the Petition was filed, Debtor Bundy has refused to turn anything over to the Chapter 7 Trustee.

18.     Owing to this conduct, Debtor Bundy should be denied a discharge under 11 U.S.C. § 727(a)(2)-(5).

## II.    PARTIES

19.     At all times relevant hereto, Plaintiff St. Luke's HS was and is a not-for-profit corporation doing business in Idaho with its principal places of business in Ada County, Idaho. St. Luke's HS was a Plaintiff in the Defamation Lawsuit.

20.     At all times relevant hereto, Plaintiff St. Luke's RMC was and is a not-for-profit corporation doing business in Idaho with its principal places of business in Ada County, Idaho. St. Luke's RMC was a Plaintiff in the Defamation Lawsuit.

21.     At all times relevant hereto, Plaintiff Mr. Roth was and is President and CEO of St. Luke's HS. Mr. Roth was a Plaintiff in the Defamation Lawsuit.

22.     At all times relevant hereto, Plaintiff Dr. Erickson was and is a physician specializing in pediatric medicine. She is an employee of St. Luke's RMC. Dr. Erickson was a Plaintiff in the Defamation Lawsuit.

23.     At all times relevant hereto, Plaintiff NP Jungman was and is a nurse practitioner specializing in pediatrics. She is an employee of St. Luke's RMC. NP Jungman was a Plaintiff in the Defamation Lawsuit.

24.     The St. Luke's Creditors are creditors in the above-captioned bankruptcy proceedings.

25.     Debtor Bundy is a resident of Utah and is the individual debtor in the above-captioned Chapter 7 case. Debtor Bundy was a Defendant in the Defamation Lawsuit.

### III.     JURISDICTION AND VENUE

26.     The St. Luke's Creditors commence this adversary proceeding pursuant to Rules 4007 and 7001(d) of the Federal Rules of Bankruptcy Procedure. This Court has jurisdiction to determine nondischargeability under Section 727 of Title 11 of the United States Code (the "Bankruptcy Code") and Sections 157 and 1334 of Title 28 of the United States Code. This is a core proceeding pursuant to Section 157(b)(2)(J) of Title 28 of the United States Code and relates to Debtor Bundy's Case No. 24-23530-WTT under Chapter 7 of the Bankruptcy Code. The St. Luke's Creditors consent to entry of final order(s) or judgment by this Court.

27.     Venue is proper in this district pursuant to Sections 1408 and 1409(a) of Title 28 of the United States Code.

### IV.     FACTUAL BACKGROUND

#### A.     Ammon Bundy

28.     Debtor Bundy is an anti-government celebrity, founder, and leader of the People's Right Network ("PRN"), former candidate for Governor of Idaho, social media influencer, online extremist personality, and is famous for leading armed standoffs and confrontations with government. Debtor Bundy is currently subject to warrants for his arrest issued by courts in Idaho for alleged actions of contempt, including harassing witnesses in violation of a court order and his ongoing violation of the Permanent Injunction.

29.     Debtor Bundy was a leader in two notorious armed standoffs with the federal government that received international media coverage. In 2014, Debtor Bundy was a leader in a

highly publicized armed standoff in Bunkerville, Nevada. In 2016, Debtor Bundy led an armed

standoff after leading an armed group of his followers to occupy Malheur National Wildlife

Refuge in Oregon. *See* https://irehr.org/reports/peoples-rights-report/ (detailing Debtor Bundy

and his past actions).

30.     After moving to Idaho in about 2020, Debtor Bundy formed PRN, an organization

with followers numbering about 60,000 that defied laws, engaged in online harassment, trespass,

and disruption of Debtor Bundy's enemies. *See*

https://www.adl.org/resources/backgrounder/ammon-bundy-and-peoples-rights (ADL report

regarding actions by Debtor Bundy and PRN).

31.     By 2022, Debtor Bundy had manufactured a number of publicized confrontations

in Idaho with state and local authorities which resulted in Debtor Bundy being repeatedly

arrested for trespass and other crimes.

32.     Debtor Bundy used the media attention to actively market himself and PRN.

Debtor Bundy used PRN members to harass his enemies and their families in Idaho. As directed

by Bundy, mobs from PRN harassed elected officials, law enforcement officers, and judges and

their families in their homes. Further, PRN members served as Debtor Bundy's on-line militia

spreading disinformation and defamatory statements regarding his enemies across the internet.

33.     By March of 2022, Debtor Bundy announced that he was running as an

Independent gubernatorial candidate and formed the Ammon Bundy for Governor of Idaho

campaign (the "Campaign"). Debtor Bundy spread defamatory statements and disinformation on

social media and through online extremist channels.

**B.**      **The Events Leading to the Defamation Lawsuit.**

34.      In March 2022, law enforcement in Meridian, Idaho determined that the Infant
was in imminent danger and brought the Infant to St. Luke's RMC's emergency room in
Meridian. The lead emergency department physician diagnosed the Infant with severe
malnourishment and dehydration and determined the Infant was in imminent danger. *See* Ex. A.

35.      Debtor Bundy, who had officially commenced his Campaign earlier that week,
determined to use the Infant's circumstances to generate publicity for his Campaign. Debtor
Bundy threatened that if the Infant was not immediately returned, there would be "hell to pay."
Debtor Bundy incited a large group from his militia, PRN, to block the ambulance bay, which
forced the hospital into lockdown. Debtor Bundy had his campaign manager and other supporters
livestream his arrest for trespass and immediately pushed content to social media accounts and
the official campaign website to promote his candidacy.

36.      The Infant was admitted to St. Luke's children's hospital in Boise for intensive
medical treatment. Debtor Bundy, working with his co-conspirators at the PRN, the Campaign,
his acolyte Diego Rodriguez, and Rodriguez's entities Freedom Man Press, LLC ("FM Press")
and Freedom Man PAC ("FM PAC"), repeatedly spread the intentionally false narrative that the
St. Luke's Creditors' care of the Infant was actually part of a conspiracy with state agencies to
commit child trafficking, kidnapping, and other heinous crimes. Debtor Bundy and his co-
conspirators published the names and personal information of (now judgment creditors) Mr.
Roth, Dr. Erickson, and NP Jungman, and encouraged followers to threaten and intimidate them.

37.      On March 12, 2022, Debtor Bundy incited an armed mob of hundreds to surround
the St. Luke's hospital in Meridian to attempt to take the Infant by force. The crowds of his

followers, fueled by the false narrative, posed such a threat that another lockdown was necessary for the safety of patients, patients' families, and hospital employees, notwithstanding the assistance from the Boise Police Department and Idaho State Police. Armed individuals attempted to enter the hospital even after it was locked down.

38.    Debtor Bundy and his co-conspirators also directed callers to flood St. Luke's with calls for the purpose of shutting down the hospital's operations. His followers obeyed, overwhelming critical phone lines with menacing calls including death threats and threats of sexual violence.

39.    Through intensive medical efforts, the Infant began gaining weight, and the risk of imminent harm dissipated. The Infant was discharged from the children's hospital into the Department of Health and Welfare's temporary care. Shortly after that, the Magistrate judge overseeing the Infant's protective custody determined that the Infant was stable enough to be returned to his parents subject to court-ordered requirements for care.

40.    Even after the Infant was no longer being treated at St. Luke's RMC, Debtor Bundy and his co-conspirators continued to promote the false conspiracy theory accusing the St. Luke's Creditors of crimes against children. Debtor Bundy did this for his own benefit, appearing on dozens of extremist alternative media broadcasts to promote his personal brand, raise money, and gain more members in the PRN by republishing the conspiracy theory. The online posts about the conspiracy theory on FM Press solicited donations ostensibly for the Infant's family's medical bills, even though they had incurred no medical expenses for the Infant's treatment.

41.    Debtor Bundy's intentional actions caused significant harm to the St. Luke's Creditors, in the form of financial losses, reputational harm, emotional distress, and other losses. Debtor Bundy intended the St. Luke's Creditors to suffer these harms, demonstrated by his own admissions and other evidence.

42.    Debtor Bundy continued his disinformation and harassment campaign long after the lockdowns and the Infant's reunification with family. Given false conspiracy provided Debtor Bundy with media attention and voter interest, he aired slick campaign commercials that spread the lies. Debtor Bundy staged political rallies centered around the false conspiracy and used the false conspiracy in ads soliciting people to join PRN.

43.    On May 11, 2022, the St. Luke's Creditors initiated the Defamation Lawsuit hoping the court could force Debtor Bundy to stop the massive disruption and harm he was causing them. In addition to Debtor Bundy, the St. Luke's Creditors filed suit against PRN, the Campaign, Rodriguez, FM Press, and FM PAC.

44.    A true and correct copy of the operative Fourth Amended Complaint filed in the Defamation Lawsuit is attached as **Exhibit B** and incorporated hereto.

45.    The St. Luke's Creditors pursued claims for defamation, invasion of privacy, intentional infliction of emotional distress, civil trespass, and violation of the Idaho Charitable Solicitation Act. The St. Luke's Creditors sought compensatory and punitive damages.

**C.    Debtor Bundy Defied the State Trial Court, Continued Defaming the St. Luke's Creditors, Harassed Witnesses, and Initiated Another Standoff to Avoid a Warrant.**

46.    On April 24, 2023, the state court entered default against Debtor Bundy. He did not file anything in the Defamation Lawsuit, although he made many public statements about it on YouTube and via other online channels. Debtor Bundy's co-defendants also defaulted.

47.     Pursuant to Idaho law, the St. Luke's Creditors were still required to prove their

damages through a jury trial. To prepare for trial, the St. Luke's Creditors properly sought

discovery from Debtor Bundy regarding his finances, but he refused to respond in violation of

the state court's orders. The St. Luke's Creditors' discovery included requests for information on

Debtor Bundy's assets, which was material to the St. Luke's Creditors' claims for punitive

damages. Specifically, the St. Luke's Creditors served requests for production seeking

information on Debtor Bundy's assets, income, and transactions. Debtor Bundy never produced

any documents, even after the court ordered him to do so. The St. Luke's Creditors noticed

Debtor Bundy's deposition multiple times and duly served the notices, but he refused to appear

each time, even after the state court ordered him to appear. The St. Luke's Creditors also served

interrogatories seeking information about Debtor Bundy's assets, income, and transactions, but

he never responded even after the state court ordered him to respond.

48.     While the Defamation Lawsuit was being litigated, Debtor Bundy mounted an

aggressive online campaign to harass the St. Luke's Creditors and witnesses who would be

testifying against him. In response, the trial court issued a protective order specifically

prohibiting Debtor Bundy from harassing the St. Luke's Creditors and witnesses. Debtor Bundy

ignored the protective order and continued his campaign of harassment hoping to intimidate the

St. Luke's Parties and witnesses from testifying against him.

49.     Debtor Bundy posted that he was hiding his assets and threatened violence if

anyone tried to collect.

**D.**  **The Trial, $52M Verdict, and Permanent Injunction.**

50.    Pursuant to Idaho default procedure, in a two-week trial in July 2023, a jury

entered a verdict on the existence and amount of damages in the Defamation Lawsuit. The jury

awarded $52 million in compensatory and punitive damages arising from the claims for

defamation, invasion of privacy, intentional infliction of emotional distress, and violation of the

Idaho Charitable Solicitation Act.

51.    Due to the existence of a civil conspiracy among Debtor Bundy and the other

defendants, liability for the entirety of the judgment was joint and several. The state court also

granted the St. Luke's Creditors' motion for permanent injunction.

52.    The trial court entered the Judgment on August 29, 2023. The Judgment was in

the amount of $51,928,306.20. This amount was the $52,000,000 verdict, minus $62,500 from

Mr. Roth's award due to Idaho Code § 6-1604(3)'s punitive damages cap, plus certain attorneys'

fees awards.

**E.**  **To Collect on the Judgment, the St. Luke's Creditors Filed a Lawsuit in Gem
County to Vacate One of Debtor Bundy's Fraudulent Transfers and Enjoin Debtor
Bundy from Transferring other Funds.**

53.    During litigation of the Defamation Lawsuit, Debtor Bundy made public

statements that he intended to hinder, delay, or defraud the St. Luke's Creditors from collecting

any judgment against him.

54.    Shortly after the Judgment, the St. Luke's Creditors began trying to collect. On

August 11, 2023 (within a year of the Petition Date), the St. Luke's Creditors filed a complaint

and motion for temporary restraining order and preliminary injunction where Debtor then lived,

Gem County, Idaho. (*St. Luke's et al. v. Bundy et al.*, in the District Court for the Third Judicial

District, County of Gem, Case No. CV23-23-0551 ("Gem County Lawsuit")). On September 8,

2023, the Gem County court entered an injunction broadly preventing Debtor Bundy from

hiding, concealing, or transferring his assets. Among other things, the Gem County Lawsuit

sought to invalidate the Debtor's December 5, 2022 sale of his residential property located at

4615 Harvest Lane, Emmett, Idaho ("Harvest Lane Property") and to collect other assets,

including bank accounts and commercial property, which were being concealed in Gem County.

57. Debtor Bundy transferred the Harvest Lane Property, valued at more than

$1,200,000 to White Barn Enterprises, LLC ("White Barn"), a business entity owned by a

limited liability company owned by his longtime personal friend, Aaron Welling, who had also

served as the treasurer for the Campaign.

56. As part of the sham transaction, White Barn paid Debtor Bundy and his wife

$250,000, less than a quarter of the Harvest Lane Property's fair market value. Debtor Bundy

used the $250,000 from White Barn to pay off all debt that he owed on the Harvest Lane

Property. White Barn took out a promissory note for $250,000 with a bank ("White Barn Note")

against the Harvest Lane Property; the White Barn Note returned to White Barn the amount

previously transferred to the Bundys for the Harvest Lane Property.

57. White Barn then entered into a "lease" with the Debtor Bundy's wife, Lisa Bundy

(the "Bundy Lease"), for a five-year term with a monthly payment of $2,620, an amount far

below the market rental rate for a residential property with a market value in excess of $1

million. The $2,620 monthly "rent" fully serviced the monthly debt on the White Barn Note. As

a result of the White Barn Note and the Bundy Lease, White Barn, in effect, paid nothing to

obtain title to the Harvest Lane Property.

58.     As part of this sham transaction, Debtor Bundy and his family did not leave the Harvest Lane Property and remained in uninterrupted possession of the property despite purporting to pass title to White Barn. The fraudulent transfer of the Harvest Lane Property remained in place well within the year of Debtor Bundy's filing of his Petition.

59.     In August of 2023, Debtor Bundy appeared in the Gem County case and dishonestly asserted that he had not participated in any fraudulent transfers. Debtor Bundy also refused to comply with his discovery obligations in the Gem County case. Debtor Bundy violated the Gem County court's clear order that he respond to written discovery relating to discovery about Debtor Bundy's assets, produce documents, and appear for his deposition.

60.     Acting to conceal his assets and hinder collection, Debtor Bundy violated court orders and refused to provide written responses, failed to produce documents, and refused to show up for his deposition. Debtor Bundy's violations were calculated, and part of his ongoing scheme to frustrate St. Luke's Creditors' efforts to collect on the Judgment and enforce the Permanent Injunction entered in the Gem County Lawsuit. Further, evidence obtained by St. Luke's Creditors through third-party discovery showed that Debtor Bundy's refusal to provide discovery was also motivated by his desire to conceal other fraudulent transfers and apparent violations of the Gem County court's preliminary injunction restricting expenditures.

61.     In response to Debtor Bundy's defiance of the court's orders, the St. Luke's Creditors moved for sanctions and contempt, arguing that without consequences, Debtor Bundy would only be emboldened to continue to harass and damage the St. Luke's Creditors—and more broadly, that should Debtor Bundy not be held accountable, the public's faith in the rule of law would be diminished.

62.     The Gem County court set a hearing on the motion for January 3, 2024. Debtor Bundy failed to appear. The court gave Debtor Bundy another chance, resetting the hearing for February 12, 2024. Again, Debtor failed to appear. The court then reset the hearing again, this time to be held on April 1, 2024. Bundy failed to appear and the judge issued a warrant for his arrest to force Debtor Bundy to appear at a contempt hearing and to force Debtor Bundy to provide sworn testimony regarding his assets.

63.     Debtor Bundy ignored the arrest warrant and continued to violate the Gem County preliminary injunction. For example, on January 11, 2024, Debtor Bundy attempts to sell three commercial properties in Gem County to be listed for sale by a real estate agent (with listing prices of $1,700,000, $275,000, and $499,000). The St. Luke's Creditors learned of this violation of the preliminary injunction in the Gem County Lawsuit and immediately moved for another temporary restraining order and preliminary injunction to stop Debtor Bundy.

64.     When St. Luke's Creditors deposed the real estate agent involved in making the listings, he testified that Debtor Bundy engaged him starting in December 2023 (within 12 months of the Petition Date) to sell the properties despite the injunctions in place in the Gem County Lawsuit. On April 17, 2024, St. Luke's Creditors again moved for a temporary restraining order and preliminary injunction to prevent Debtor Bundy's actions. On May 3, 2024, the court in the Gem County Lawsuit issued another preliminary injunction against Debtor Bundy.

65.     When Debtor Bundy filed his Petition in July of 2024, proceedings in the  Gem County Lawsuit were stayed. The injunctions in the Gem County Lawsuit remains in place and

Debtor Bundy continues to violate them. Likewise, Debtor Bundy continues to evade the arrest warrant and the contempt hearing.

**F.      As Debtor Bundy Moved to Utah to Avoid Accountability in Idaho, the St. Luke's Creditors Filed an Action in Utah.**

66.      In April 2024 (within 12 months of the Petition Date), St. Luke's Creditors, again seeking to collect on their judgment and address Debtor Bundy's ongoing violations of the Permanent Injunction, commenced an action in the Fifth Judicial District Court, in Washington County ("Utah Lawsuit"), *St. Luke's Health System LTD, et. al, vs. Ammon Bundy, et. al., Case No: 246501034.*

67.      Through the Utah Lawsuit, St. Luke's Creditors sought to immediately freeze all assets in bank accounts in the name of Debtor Bundy, as well as entities he established and controlled until the conclusion of a separate Idaho court action to pierce the corporate veil was adjudicated. Debtor Bundy had abused the corporate cloak to frustrate St. Luke's Creditors' collection efforts.

68.      On April 22, 2024, the Utah Court granted St. Luke's Creditors' motion for preliminary relief, finding that absent an injunction, St. Luke's Creditors faced continued irreparable harm to their ability to collect the $52 million Judgment. St. Luke's Creditors also requested that the court hold judgment debtors, including Debtor Bundy, in contempt of court and require them to appear personally at the Utah Court and explain why they violated the Judgment.

69.      The Utah Court ordered judgment debtors to appear personally at the Fifth District Court in Washington County, to explain whether they violated the Judgment. In violation

of that order, however, Debtor Bundy did not appear at the May 20, 2024 hearing. Concurrently

with the above, St. Luke's Creditors filed a motion for a supplemental proceeding for an

examination to identify Debtor Bundy's property, which the Court granted. The examination of

Debtor Bundy was set in St. George, Utah, near Debtor Bundy's now suspected residence, on

June 20, 2024.

70.     The court in the Utah Lawsuit ordered Debtor Bundy to respond to written

questions regarding his assets and indicated that if Debtor Bundy answered fully and truthfully, it

would eliminate his need to attend the Debtor's examination. However, the court held that if

Debtor Bundy failed to comply with its order requiring the written responses, the court could

impose sanctions against Debtor Bundy.

71.     Despite the court order, Debtor Bundy did not supply written information to St.

Luke's Creditors about his assets. Debtor Bundy then violated the court's order by failing to

appear for a Debtor's examination on June 20, 2024.

72.     St. Luke's Creditors were compelled to ask the Utah Court to enforce its order

and for sanctions. The Utah Court set an evidentiary hearing on St. Luke's Creditors' motion to

enforce and for sanctions for September 5, 2024.

73.     On the Petition Date, proceedings in the Utah Lawsuit were automatically stayed.

**G.     <u>Arizona Real Estate Transaction</u>.**

74.     In addition to the fraudulent transactions, acts to conceal assets, and acts to hinder

St. Luke's Creditors ability to collect on the Judgment, Debtor Bundy has engaged in additional

wrongful conduct in the year prior to the Petition Date and many of those actions remain

ongoing.

75.     In July 2019, Debtor Bundy and his wife Lisa Bundy entered into an owner-carry

purchase agreement with a third-party borrower for their property located at 5245 W. Dobbins

Rd., Laveen, Arizona (the "Arizona Property"). The Bundys sold the Arizona Property for

$482,500.00 with interest at the rate of 9.75%.

76.     On November 28, 2022, Debtor Bundy and Lisa Bundy assigned the payments of

the Arizona Property loan agreement to Global Trading Incorporated ("Global Trading"). Global

Trading is an entity owned by Tom and Rebecca Branson, then-active PRN members devoted to

Debtor Bundy. Tom Branson assisted Debtor Bundy on tour during Debtor Bundy's campaign

for governor of the State of Idaho.

77.     Sometime after the November 28, 2022 assignment, the third-party borrower paid

off the note on the Arizona Property. Under the terms of the assignment, Global Trading held the

payoff proceeds.

78.     On January 5, 2024, Global Trading, on one hand, and Debtor Bundy and Lisa

Bundy, on the other hand, entered into an Estopped Certificate, Release & Waiver, whereby

Global Trading dispersed "certain funds belonging to Ammon E. and Lisa M. Bundy" amounting

to $487,167.36. These were the funds from the payoff of the Bundys' note on the Arizona

Property. Under the express terms of the Estopped Certificate, Release & Waiver, the Bundys'

funds were distributed directly to the corporation Abish-husbondi (the "Arizona Property

Proceeds Transfer").

79.     Debtor Bundy had formed Abish-husbondi on or about July 26, 2019 in

Wyoming. At formation, Debtor Bundy was the sole incorporator, sole officer, and sole

shareholder. On information and belief, at the time of the Arizona Property Proceeds Transfer,

Debtor Bundy remained the sole officer and sole shareholder of Abish-husbondi—or at the very

least, Debtor Bundy was the sole officer and a majority shareholder of Abish-husbondi.

80.     Debtor Bundy commingled his personal funds with those of Abish-husbondi since

its formation. Debtor Bundy failed to treat Abish-husbondi as a separate corporation and Abish-

husbondi was Debtor Bundy's alter-ego.

81.     There was no legitimate reason for the proceeds from the Arizona Property, which

belonged to the Bundys, to be transferred to Abish-husbondi in January 2024. Instead, Debtor

Bundy directed the Arizona Property Proceeds Transfer in order to defraud the St. Luke's

Creditors and avoid paying any amount toward the Judgment.

**H.     The Abish-husbondi Shares.**

82.     On December 8, 2022, Debtor Bundy transferred 710,000 shares of his stock in

Abish-husbondi to Global Trading. Abish-husbondi's stock totaled 1,000,000 shares. Abish-

husbondi held title to commercial real estate in Emmett, Idaho valued well over $1 million.

83.     Debtor Bundy orchestrated a sham transaction by accepting a check from Tom

and Rebecca Branson for $15,000. Debtor Bundy deposited that check into the Abish-husbondi

bank account held at Clarity Credit Union in Emmett, Idaho. Debtor Bundy also caused the

Campaign to cut a check to Tom Branson in the amount of $15,000.

84.     In late summer of 2023, the Bransons became concerned about their role in

assisting Debtor Bundy with defrauding his judgment creditors. To unwind the schemes, they

had engaged in with Debtor Bundy, on August 9, 2023, Tom Branson returned the Abish-

husbondi shares that had ostensibly been held by Global Trading.

**I.**     **The Global Clean Energy Holdings Stock Purchase.**

85.     Sometime in early summer of 2022, Debtor Bundy contacted the Bransons with a plan to conceal assets from the St. Luke's Creditors.

86.     In early June 2022, Debtor Bundy transferred $120,000 to the Branson's company, Global Trading. Debtor Bundy asked the Bransons to purchase stock for him, but not in his name.

87.     Pursuant to Debtor Bundy's direction, Rebecca Branson used Debtor Bundy's $120,000 to purchase stock in a publicly traded company called Global Clean Energy Holdings. Although she bought the shares for Debtor Bundy, Rebecca Branson purchased them in her own name.

88.     The relationship between Debtor Bundy and the Bransons soured in late summer of 2023 when they became concerned about assisting Debtor Bundy in his efforts to defraud judgment creditors. At that point, the Bransons liquidated the stock and mailed Debtor Bundy check on or around August 19, 2023 for the money Debtor Bundy had given them to purchase the stock.

**J.**     **The TLA Enterprises Account.**

89.     In August 2023, Debtor Bundy's father-in-law incorporated TLA Enterprises, LLC as a closed limited liability company in Wyoming. TLA Enterprises opened an account at the State Bank of Southern Utah, with Debtor Bundy's wife as a signatory (the "TLA Enterprises Account").

90.     As of April 2024, the TLA Enterprises Account held more than $17,000 in cash.

91.     Although Lisa Bundy is a signatory on the account, Debtor Bundy has represented to this Court that she does not earn any income.

92.     Upon information and belief, Debtor Bundy directed the establishment of TLA Enterprises and the TLA Enterprises Account to conceal his own cash from his judgment creditors through use of his wife's name and a shell corporation formed the same month that the court entered the Judgment.

**K.     Additional Transactions with Family Members and Friends to Conceal Assets.**

93.     In the twelve months preceding the Petition Date, Debtor Bundy engaged in transactions with his brothers to conceal assets, including, but not limited to, transferring more than $400,000 to his brother Ryan Bundy and more than $200,000 to his brother Arden Bundy. Debtor Budny made these transactions to conceal assets from the St. Luke's Creditors. In the twelve months preceding Debtor Bundy's Petition, Debtor Bundy has engaged in cash transfers to conceal assets from St. Luke's Creditors and to hinder collection of the Judgment. Debtor Bundy currently has in his custody and control approximately $200,000 related to cash transactions that were conducted to hide assets and hinder collection of the Judgment. These transactions were concealed from the St. Luke's Creditors and were not properly disclosed in bankruptcy proceedings.

94.     In the twelve months prior to his Petition, Debtor Bundy engaged in transactions with Arden Bundy and others to control intellectual property, domain names, and assets associated with Bundy Motors Company. These transactions were concealed from the St. Luke's Creditors and were not properly disclosed in bankruptcy proceedings.

95.     Although Debtor Bundy is not listed in corporate documents as having an ownership interest in Bundy Motors Company, Debtor Bundy is the true owner of Bundy Motors Company and all of its assets which include, but are not limited to, receivables, trucks, and inventory. These transactions were concealed from the St. Luke's Creditors and were not properly disclosed in bankruptcy proceedings.

96.     In the twelve months prior to the Petition Date, Debtor Bundy worked with contacts including, but not limited to, Mr. Scott Malone to enter into valuable leases and other contracts which generated revenue for Debtor Bundy. These transactions were done in a manner as to conceal the assets from the St. Luke's Creditors and in violation of existing court orders. These transactions were concealed from the St. Luke's Creditors and were not properly disclosed in bankruptcy proceedings.

97.     After entry of the Judgment and before Debtor Bundy filed his Chapter 7 petition with this Court, the St. Luke's Creditors took steps to collect from Debtor Bundy. These efforts have included, among other things, obtaining title to the Harvest Lane Property, executing on— and purchasing at sheriff's sale—Debtor Bundy's shares in two corporations (Abish-husbondi and Dono Custos, Inc.), and freezing bank accounts.

98.     The St. Luke's Creditors' collection efforts have been hindered and delayed by Debtor Bundy's concealment and transfers of assets and use of others to shield his involvement.

**L.     <u>Debtor Bundy's Chapter 7 Bankruptcy.</u>**

99.     Debtor Bundy filed the Petition on July 17, 2024 in Utah. Debtor Bundy signed his Chapter 7 petition under penalty of perjury.

-23-

100.    With his Chapter 7 petition, Debtor Bundy filed a Chapter 7 Statement of Current
Monthly Income, signed under penalty of perjury. On Question 6, Debtor Bundy stated "$0.00"
for gross receipts and net monthly income from rental or other real property. This statement was
and is false.

101.    In 2024, Debtor Bundy signed on behalf of Abish-husbondi a purported lease
agreement with tenant Nutragem, LLC to lease certain commercial premises owned by Abish-
husbondi. The lease agreement provides for monthly rental payments of $4,434.37 to be sent to
Debtor Bundy at his personal address, the same P.O. Box that Debtor Bundy uses as his personal
mailing address: P.O. Box 1062, Cedar City, UT 84721. Debtor Bundy has been receiving rental
payments from Nutragem, LLC since June 2024.

102.    At the time Debtor Bundy filed his Petition, he had custody and control of
$200,000 in cash, owned Bundy Motors Company, owned intellectual property relating to brake
systems, and had contracts and leases from businesses occupying space in a warehouse in Gem
County, Idaho. Debtor Bundy did not disclose these assets in his Chapter 7 Petion or properly
disclose them in his Schedules of Assets and Liabilities (the "Schedules") or Statement of
Financial Affairs (the "SOFA").

103.    Debtor Bundy failed to comply with his obligations in examination in this
bankruptcy. Debtor Bundy has failed to answer questions relating to his assets based on specious
objections, failed to appear for properly authorized and noticed examination under Rule 2004,
failed to produce documents responsive to proper subpoena duces tecum requests. Documents
Debtor Bundy has failed to produce include, but are not limited to, transactional documents
relating to loans and transfers with Ryan Bundy and Arden Bundy, documents relating to Abish-

husbondi, contacts with tenants, records relating to his transactions with Global Trading, and documents relating to his employment with Abish-husbondi.

104.    In the twelve months prior to his Petition, Debtor Bundy has destroyed or purposefully failed to create documents relevant to his assets, including but not limited to, tax returns, employment payments from Abish-husbondi, leases with tenants in Gem County, financial records relating to Abish-husbondi, loans and transfers with Ryan Bundy and Arden Bundy, transactions with his father-in-law, his employment records relating to Bundy Motors Company, cash transactions, and his transactions with Global Trading.

## V.    FIRST CAUSE OF ACTION

### (Denial of Discharge Under 11 U.S.C. § 727(a)(2))

105.    The St. Luke's Creditors incorporate, and reallege each and every allegation contained above as if fully set forth herein.

106.    Section 727(a)(2)(A) of the Bankruptcy Code provides that denial of a debtor's discharge is appropriate when "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(A) property of the debtor, within one year before the date of the filing of the petition[.]"

107.    Debtor Bundy acted with actual intent to hinder, delay, or defraud the St. Luke's Creditors when he directed the Arizona Property Proceeds Transfer.

108.    Debtor Bundy acted with actual intent to hinder, delay, or defraud the St. Luke's

Creditors when he engaged in the transfer and concealment of the 710,000 shares of Abish-

husbondi with the Bransons.

109.    Debtor Bundy acted with actual intent to hinder, delay, or defraud the St. Luke's

Creditors when he engaged in transactions with Ryan Bundy and Arden Bundy relating to cash

transactions, supposed loans, Bundy Motors Company, and other business ventures.

110.    Debtor Bundy acted with actual intent to hinder, delay, or defraud the St. Luke's

Creditors when he directed others to purchase securities, conduct real estate transactions, operate

business entities, open bank accounts, enter leases and contracts in their name to mask Debtor

Bundy's custody and control of those assets.

111.    Debtor Bundy acted with actual intent to hinder, delay, or defraud the St. Luke's

Creditors when he directed the formation of TLA Enterprises, LLC, and the secretion of funds in

the TLA Enterprises Account.

112.    Debtor Bundy acted with actual the intent to hinder, delay, or defraud the St.

Luke's Creditors or an officer of the estate charged with custody of property when he transferred

or concealed the Nutragem, LLC lease rental income.

113.    Debtor Bundy acted with actual the intent to hinder, delay, or defraud the St.

Luke's Creditors or an officer of the estate charged with custody of property under this title when

he engaged on the transactions identified in this complaint.

114.    Debtor Bundy's intent is evidence through multiple "badges of fraud," including

his active concealment of pre-bankruptcy conversions and transfers by, among other things,

using his family members and supporters to hide his assets as described in the preceding paragraphs.

115.    As described above, Debtor Bundy converted or transferred millions of dollars' worth of assets within one year before the Petition Date. He entered into several sham transactions whereby he purported to transfer assets to third parties but continued to use or derive a benefit from the transferred assets. And as described above, in several cases, the third-parties returned the assets to him, but he still has not accounted for them in this case. And Debtor Bundy made many of his large prepetition transfers after entry of the $50 million Judgment against him in the Defamation Lawsuit.

116.    Debtor Bundy should be denied discharge of the debt to his judgment creditors, including the St. Luke's Creditors, pursuant to 11 U.S.C. § 727(a)(2)(A).

## VI.    SECOND CAUSE OF ACTION

### (Denial of Discharge Under 11 U.S.C. § 727(a)(2)(B))

117.    The St. Luke's Creditors incorporate, and reallege each and every allegation contained above as if fully set forth herein.

118.    Section 727(a)(2)(b) of the Bankruptcy Code provides that denial of a debtor's discharge is appropriate when "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—(B) property of the estate, after the date of the filing of the petition."

119.    After the Petition Date, Debtor Bundy's whole pattern of conduct shows that he intentionally concealed, or withheld knowledge of the whereabouts, of his assets, has refused to turn over unexempt assets despite being ordered to do so.

120.    For example, Debtor Bundy has refused to disclose the fate of the proceeds of the Arizona House, and has refused to explain the fate of the $6 to $7 million in assets he claimed to have less than one year before the Petition Date.

121.    Debtor Bundy has not filed complete records. For example, his Schedules and SOFA omit key information, including millions of dollars' worth of property that either Debtor Bundy holds directly or indirectly through one of his companies, or transferred within the two years preceding the Petition Date, including, for example, his transfers of 710,000 shares of his stock in Ambish-husbondi to Global Trading in on or about December 8, 2022.

122.    Debtor Bundy's whole pattern of conduct, including his continuous attempts to deprive the St. Luke's Creditor's from opportunities to even inquire about his assets pre- and post-petition show that that Debtor Bundy's concealment is intentional.

123.    Debtor Bundy is not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(2)(B).

## VII.    THIRD CAUSE OF ACTION

### (Denial of Discharge Under 11 U.S.C. § 727(a)(3))

124.    The St. Luke's Creditors incorporate, and reallege each and every allegation contained above as if fully set forth herein.

125.    Section 727(a)(3) of the Bankruptcy Code provides that denial of a debtor's discharge is appropriate when: "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and

papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]"

126.    The Debor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve documents and other records from which his financial condition or business transactions might be ascertained. In addition, Debtor Bundy has refused to respond to discovery in the Gem County Lawsuit, Utah Lawsuit, and in these bankruptcy proceedings regarding his financial condition and transactions, despite his obligation under the Idaho Rules of Civil Procedure, Utah Rules of Civil Procedure, under the Bankruptcy Rules, and pursuant to court orders requiring him to respond.

127.    On information and belief and based on the fraudulent transfers and concealments set forth in this Complaint, Debtor Bundy continues to conceal, destroy, mutilate, falsify, or fail to keep or preserve documents and other records from which his financial condition or business transactions might be ascertained.

128.    Debtor Bundy's failure to maintain, or refusal to produce, the information described above has made it impossible to ascertain his financial conditions and material business transactions both pre- and post-petition. For example, because of Debtor Bundy's failure to maintain, or refusal to produce, the financial information described above, the Trustee and creditors like the St. Luke's Creditors are unable to ascertain what happened to the $6 to $7 million in assets he claimed to have less than one year before his Petition Date, including what happened to the balance of the proceeds generated from the sale of the Arizona Property.

129.     Debtor Bundy should be denied discharge of the debt to his judgment creditors, the St. Luke's Creditors, pursuant to 11 U.S.C. § 727(a)(3).

## VIII.     FOURTH CAUSE OF ACTION

### (Denial of Discharge Under 11 U.S.C. § 727(a)(4))

130.     The St. Luke's Creditors incorporate, and reallege each and every allegation contained above as if fully set forth herein.

131.     Section 727(a)(4) of the Bankruptcy Code provides in relevant part that denial of a debtor's discharge is appropriate when: "the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath or account; (B) presented or used a false claim; (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs."

132.     Debtor Bundy knowingly and fraudulently made a false oath or account or presented or used a false claim when he signed under penalty of perjury his Schedules, SOFA, and Statement of Current Monthly Income.

133.     The Schedules and SOFA omit key information, including millions of dollars' worth of property that either Debtor Bundy holds directly or indirectly through one of his companies, or transferred within the two years preceding the Petition Date, including, for example, his transfers of 710,000 shares of his stock in Ambish-husbondi to Global Trading in on or about December 8, 2022.

134.    The Statement falsely claims that Debtor Bundy receives no rental income, when he is receiving $4,434.37 in monthly rental income from Nutragem, LLC.

135.    Debtor Bundy's omissions and misrepresentations prevented the Trustee and the St. Luke's Creditors from discovering other estate assets, and assets that could have satisfied the St. Luke's Creditors' judgment, including, for example, the $200,000 in cash that the Debtor has now admitted he is holding.

136.    Debtor Bundy should be denied discharge of the debt to his judgment creditors, the St. Luke's Creditors, pursuant to 11 U.S.C. § 727(a)(4).

## IX.     FIFTH CAUSE OF ACTION

137.    The St. Luke's Creditors incorporate, and reallege each and every allegation contained above as if fully set forth herein.

138.    Section 727(a)(5) of the Bankruptcy Code provides that denial of a debtor's discharge is appropriate when: "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]"

139.    Debtor Budny has failed to explain satisfactorily why he only declared $1.4 million in his Schedules despite claiming to have $6 million to $7 million in assets less than a year prior to his Petition Date.

140.    Debtor Bundy has failed to explain satisfactorily the dissipation or concealment of the Arizona Property proceeds; the transfer and concealment of a controlling interest in Abish-husbondi with valuable commercial real estate holdings; the creation and use of TLA

Enterprises, LLC and the funds that flowed through it; or the concealment of the Nutragem, LLC rental income.

141.    Despite receiving multiple opportunities to do so, including at his meeting of creditors and 2004 examination, Debtor Bundy has not satisfactorily explained what happened to his assets, and has not provided evidence that their dissipation is the result of good faith and businesslike conduct.

142.    Instead, corroborating evidence, including Debtor Bundy's multiple attempts to transfer property to other parties like his brothers and the Bransons, shows that Debtor Bundy transferred or hid his assets to shield them from collection by the St. Luke's Creditors or to prevent them from becoming part of his bankruptcy estate.

143.    Debtor Bundy should be denied discharge pursuant to 11 U.S.C. § 727(a)(5).

## X.    PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court enter judgment:

a)      Denying a discharge to Debtor Bundy pursuant to 11 U.S.C. §§ 727(a)(2)(A), 727(a)(2)(B), (a)(3), (a)(4), and (a)(5); and

b)      Granting Plaintiffs such other and further relief as this Court deems just and proper.

Dated this 6th day of April, 2025.

HOLLAND & HART LLP

*/s/Erik F. Stidham*
Erik F. Stidham (admitted *pro hac vice*)
Engels J. Tejeda (USB #11427)
Benjamin D. Passey (USB #19324)
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE BY MAIL OR OTHER MEANS**

I HEREBY CERTIFY that on this 6th day of April, 2025, I caused the foregoing **COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT (SECTION 727)** to be filed electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Mark C. Rose
McKay, Burton & Thurman, P.C.
trustee@mbt-law.com

U.S. Trustee
USTPRegion19.SK.ECF@usdoj.gov

AND I FURTHER CERTIFY that on April 7, 2025 I served the foregoing on the following non-CM/ECF Registered Participants by U.S. First Class Mail and/or e-mail as indicated:

By U.S. First Class Mail – postage prepaid:

Ammon Edward Bundy, pro se
P.O. Box 1062
Cedar City, UT 84721

Ammon Edward Bundy
896 E 400 S
New Harmoney, UT 84757

By E-Mail:

Ammon E. Bundy
aebundy@bundyfarms.com

/s/ Erik F. Stidham
Erik F. Stidham
of HOLLAND & HART LLP

34280740_v7

-33-